Slip Op. 13-137

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HUBSCHER RIBBON CORP., LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Leo M. Gordon, Judge <br><br> Court No. 13-00004 |

**OPINION**

Dated: November 8, 2013

[Plaintiff's motion for judgment on the agency record denied; final results of administrative review sustained.]

    John J. Kenkel, Gregory S. Menegaz, and J. Kevin Horgan, DeKieffer & Horgan, of Washington, DC, for Plaintiff Hubscher Ribbon Corp., Ltd.

    Ryan M. Majerus, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With him on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director.  Of counsel on the briefs was George Kivork, U.S. Department of Commerce, Office of the Chief Counsel for Import Administration, of Washington, DC.

    Gregory C. Dorris, Pepper Hamilton, LLP, of Washington, DC, for Defendant-Intervenor Berwick Offray, LLC.

    **Gordon, Judge:**  This action involves an administrative review conducted by the United States Department of Commerce ("Commerce") of the antidumping duty order covering narrow woven ribbons with woven selvedge from Taiwan.  See Narrow Woven Ribbons with Woven Selvedge from Taiwan, 77 Fed. Reg. 72,825 (Dep't of Commerce Dec. 6, 2012) (final results admin. review) ("Final Results"); see also Issues and Decision

Memorandum for the Final Results of the Antidumping Duty Administrative Review on Narrow Woven Ribbons with Woven Selvedge from Taiwan, A-583-844 (Dep't of Commerce Dec. 6, 2012) ("Decision Memorandum"), available at http://enforcement.trade.gov/frn/summary/taiwan/2012-29542-1.pdf (last visited Nov. 4, 2013). Before the court is Plaintiff Hubscher Ribbon Corp., Ltd.'s ("Hubscher") motion for judgment on the agency record challenging Commerce's assignment of a total adverse facts available ("AFA") rate of 137.20%. See Pl.'s Rule 56.2 Mot. for J. upon the Agency R. at 1-2, ECF No. 29 ("Pl.'s Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006). For the reasons set forth below, the court denies the motion and sustains Commerce's determination.

## I. Standard of Review

The court sustains Commerce's determinations, findings, or conclusions in administrative reviews of antidumping duty orders unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition, and all applicable supplements.

conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2013). Therefore, when addressing a substantial evidence issue, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2013).

## II. Background

During the less than fair value ("LTFV") investigation, Commerce assigned dumping margins of 0.00%, 0.00%, and 4.37% to three individually investigated respondents. Narrow Woven Ribbons with Woven Selvedge from Taiwan, 75 Fed. Reg. 41,804, 41,804-07 (Dep't of Commerce July 19, 2010) (final determ.). Hubscher was not individually investigated and was assigned the 4.37% "all others" rate. See id. In the first administrative review Hubscher was the only mandatory respondent. Final Results, 77 Fed. Reg. at 72,825. Hubscher cooperated initially. In response to Commerce's quantity and value questionnaire, Hubscher disclosed that it imported approximately 12,700 100-yard spools of in-scope Taiwanese ribbon having a total value of $135,000. Letter from Hubschercorp to Dep't of Commerce: Quantity and Value Data (Jan. 17,

2012), PD 26/CD 1 Att. 1 at 1-2 ("Hubscher Q&V Data").[2]  Hubscher did not specify the model of these ribbons or provide any other information as to what materials, shapes, or characteristics they featured.  Id.  Soon thereafter Hubscher notified Commerce that it no longer intended to cooperate in the administrative review because it lacked "the person[n]el [and] financial resources."  Correspondence with Hubschercorp regarding the 2010-2011 Antidumping Duty Administrative Review of Narrow Woven Ribbons with Woven Selvedge from Taiwan (Dep't of Commerce Feb. 27, 2012), PD 39 at 4-5.

Commerce determined that Hubscher's refusal to cooperate justified application of total AFA.  Narrow Woven Ribbons with Woven Selvedge from Taiwan, 77 Fed. Reg. 32,938, 32,940 (Dep't of Commerce Dec. 6, 2012) (prelim. results admin. review).  Consistent with its "practice . . . to select the highest rate on the record of the proceeding and to ensure that the margin is sufficiently adverse," Commerce preliminarily assigned Hubscher the highest rate alleged in the petition, 137.20%.  Id.  Commerce then sought to corroborate its selection using "information from independent sources reasonably at its disposal."  Id.; see 19 U.S.C. § 1677e(c).  Commerce placed on the record certain pages from the investigation margin programs showing that two of the individually investigated, cooperative respondents "had multiple model-specific margins higher than 137.20 percent."  Placement of Proprietary Model-Specific Margins from the Investigation on the Record and Corroboration of AFA Rate (Dep't of Commerce May 29, 2010), PD 41/CD 2 ("Model Specific Margin Data").

---

[2] "PD" refers to a document contained in the public administrative record.  "CD" refers to a document contained in the confidential record.

Commerce upheld its selection of the petition rate in the <u>Final Results</u> over Hubscher's objections. <u>Final Results</u>, 77 Fed. Reg. at 72,825. Commerce reiterated its confidence in the calculations underlying the petition rate because "the export price was based on a confidential price quote from a ribbon manufacturer and the normal value was built based mostly on publicly-available rates and the petitioner's own experience." <u>Decision Memorandum</u> at 5. Commerce also explained that "there is a link between the petition rate and [Hubscher's] own commercial activity because [Hubscher] imported subject merchandise into the United States in similar quantities" to the quantity of model-specific entries near or above the petition rate, "and at equivalent spool sizes" to one particular model-specific entry above the petition rate. <u>Id.</u> at 5-6.

Hubscher challenges the <u>Final Results</u>, arguing that the highest petition rate, 137.20%, has been discredited by Commerce's calculated rates assigned in the investigation, 0.00%, 0.00%, and 4.37%. Hubscher further argues that Commerce did not reasonably corroborate the petition rate.

### III. Discussion

In a total AFA scenario like the one presented here, Commerce typically cannot calculate an antidumping rate for an uncooperative respondent because the information required for such a calculation (the respondent's sales and cost information for the subject merchandise during the period of review) has not been provided. As a substitute, Commerce relies on various "secondary" sources of information (the petition, the final determination from the investigation, prior administrative reviews, or any other information placed on the record), 19 U.S.C. §§ 1677e(b), (c), to select a proxy to serve as a

"reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." F.LLI de Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("de Cecco"). When selecting an appropriate total AFA proxy, "Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing compliance." Timken Co. v. United States, 354 F.3d 1334, 1345 (Fed. Cir. 2004). The proxy's purpose "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." de Cecco, 216 F.3d at 1032. Although a higher AFA rate creates a stronger incentive to cooperate, "Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin." Gallant Ocean (Thailand) Co., v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (citing de Cecco, 216 F.3d at 1032). "Commerce must select secondary information that has some grounding in commercial reality." Id. at 1323-24.

As de Cecco explained, these requirements are logical outgrowths of the statute's corroboration requirement, 19 U.S.C. § 1677e(c), which mandates that Commerce, to the extent practicable, corroborate secondary information. See de Cecco, 216 F.3d at 1032. In practice "corroboration" involves confirming that secondary information has "probative value," 19 C.F.R. § 351.308(d) (2013), by examining its "reliability and relevance." Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007) (citing Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, 70 Fed. Reg. 54,711, 54,712-13 (Sept. 16, 2005) (final results admin. reviews)). More simply, to corroborate the selection of a total AFA rate,

Commerce must (to the extent practicable) "demonstrate that the rate is reliable and relevant to the particular respondent" in light of the whole record before it. Yantai Xinke Steel Structure Co. v. United States, 36 CIT ___, ___, Slip Op. 12-95 at 27 (July 18, 2012); PSC VSMPO-AVISMA Corp. v. United States, 35 CIT ___, ___, 755 F. Supp. 2d 1330, 1336-37 (2011) (citing Gallant Ocean, 602 F.3d at 1323-24); de Cecco, 216 F.3d at 1032 ("Obviously a higher adverse margin creates a stronger deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.").

At first glance, Commerce's selection of a 137.20% petition rate as total AFA does seem unreasonable when measured against the actual margins Commerce calculated for the individually investigated, cooperative respondents: 0.00%, 0.00%, and 4.37%. After all, in Gallant Ocean the Federal Circuit held that Commerce's assignment of a 57.64% AFA petition rate was unreasonable when measured against actual calculated margins between 5.91% and 6.82% in the investigation, and 2.58% and 10.75% during the first administrative review. Gallant Ocean, 602 F.3d at 1323-24. On remand Commerce ultimately settled on a total AFA rate of 14.34%. Gallant Ocean (Thailand) Co. v. United States, Court No. 1:07-cv-00360, Final Results of Redetermination Pursuant to Court Remand at 1, 17, ECF No. 56 (Oct. 20, 2010).

Hubscher seeks a similar outcome here, focusing on the four mentioned data points: 0.00%, 0.00%, 4.37%, and 137.20%. If the court's analysis were limited to these

Court No. 13-00004                                                                                           Page 8

four data points, one could question whether the AFA rate represents a reasonable proxy for Hubscher's actual rate plus some built-in increase intended to deter non-compliance. The court's analysis, however, is not so limited because Commerce's corroboration went beyond those four data points. Commerce examined model specific margin data from the cooperative respondents in the investigation and compared it to Hubscher's quantity and value data (submitted before Hubscher ceased cooperating).

> More specifically, as Commerce explained in its corroboration memo:
>
> As an initial matter, we disagree with Hubschercorp that we have relied on only "a few sales" to corroborate the petition rate. At the time of the preliminary results, as we stated in the course of our corroboration analysis, we identified "multiple model-specific margins higher than 137.20 percent" calculated for [ . . . ] in the LTFV investigation. Specifically, the output pages placed on the record at that time reflect the automatic SAS output from the LTFV programs, and consist of the [ . . . ] highest antidumping duty margins calculated for individual models . . . . Using these output pages on the record of the review, we identified [ . . . ] model-specific margins, corresponding to [ . . . ] spools of merchandise, with margins above the petition rate, and [ . . . ] additional models corresponding to [ . . . ] spools of merchandise in the range of the petition rate. . . . Given that a substantial number of actual U.S. sales transactions were dumped at the same rate as, or at an even higher level than, the petition margin, we find that the petition rate is neither aberrational nor divorced from commercial reality, but rather is corroborated with the limited evidence available on the record.
>
> . . . .
>
> [Furthermore], we find that there is a plausible link between the merchandise used in our corroboration analysis and Hubschercorp's own commercial reality. Specifically, Hubschercorp reported in its Q&V response that it exported to the United States spools of subject merchandise with a spool capacity of [ . . . ] yards during the POR. . . . Among the model-specific margins used to corroborate the highest petition rate in the Preliminary Results, the Department calculated a dumping margin of [ . . . ] percent for a model of subject merchandise sold in [ . . . ]-yard spools. . . . It is reasonable to assume that size of the spool is a material factor in determining the price of narrow woven ribbon. Thus, because a model of similarly-sized merchandise was dumped at a rate

> exceeding the petition rate, it is plausible that Hubschercorp also sold ribbons during the POR at a level in the range of the petition rate of 137.20 percent.

Confidential Corroboration Memorandum (Dep't of Commerce Nov. 29, 2012), CD 3 at 2-3 (citing Model Specific Margin Data at Att. I; Hubscher Q&V Data at Att. 1) ("Corroboration Memorandum") (confidential information omitted); see also Decision Memorandum at 5-6.

    This appears to be a reasonable effort to corroborate the petition rate against (1) the model-specific margin information from the investigation and (2) the only available record information about Hubscher—its quantity and value data. Commerce basically infers from Hubscher's spool size that Hubscher deals in relatively higher margin merchandise, and hence, the petition rate is a reasonable choice for Hubscher's total AFA rate. Hubscher argues that Commerce's corroboration is unreasonable. Specifically, Hubscher contends there are a "plethora of factors" that determine ribbon prices other than "spool size" and "spool quantity." Pl.'s Br. at 18 (noting that the scope of the antidumping duty order lists numerous attributes of covered ribbons). According to Hubscher the U.S. sales price of a ribbon "is based, in large part, on the sophistication of the ribbon and, hence, its cost to produce," meaning "these factors, taken together, far outweigh the importance of the number of spools or the length of ribbon on an individual spool." Id. Of course, had Hubscher cooperated and provided all the requested information, its final calculated margin would have been based on a "plethora of factors." Hubscher, however, did not cooperate, and the only information Commerce had to tie the petition rate to Hubscher was Hubscher's quantity and value data, which included spool

size and quantity (and not much else).  Hubscher Q&V Data Att. 1 at 1-2.  Hubscher's argument that Commerce's corroboration impermissibly focuses on those metrics rather than on the full "plethora of factors" for ribbon pricing is unpersuasive when measured against Hubscher's own lack of cooperation and failure to provide that very data.  Instead, Commerce analyzed the data reasonably at its disposal, which included Hubscher's spool size and quantity.  Although Hubscher contends that these metrics are "essentially meaningless," Pl.'s Br. at 18-20, they are not.  See Issues and Decision Memorandum for the Antidumping Duty Investigation of Narrow Woven Ribbon with Woven Selvedge from Taiwan, A-583-844 (Dep't of Commerce July 19, 2010), available at http://enforcement.trade.gov/frn/summary/taiwan/2010-17538-1.pdf (last visited Nov. 4, 2013).  ("[W]e solicited data from the respondents in this case on a per-spool basis because this is the unit of measure used to set their prices."); Narrow Woven Ribbons with Woven Selvedge from Taiwan, 75 Fed. Reg. 7236, 7240 (Dep't of Commerce Feb. 18, 2010) (prelim. determ.) (listing "spool capacity" as the fifth most important physical characteristic among sixteen).

Commerce identified "dozens" of model-specific margins from the investigation that were at or above the petition rate, "covering . . . thousands of spools of ribbons."  Decision Memorandum at 5.  Commerce then used available record information to present a "plausible" link between Hubscher's merchandise and this high-margin model-specific data.  Corroboration Memorandum at 3.  Although Hubscher contends that Commerce "cherry picked" the data, Pl.'s Br. at 21, Hubscher fails to demonstrate the unreasonableness of Commerce's inference that Hubscher dealt in high margin

merchandise.  Hubscher does not explain why the only permissible inference to be drawn from the administrative record is that it never dealt in the higher-margin model-specific ribbon, or that Hubscher overwhelmingly dealt in lower-margin model-specific ribbon.  See id. at 18-23.  When Hubscher advanced its "cherry picking" argument, the court anticipated a showing from Hubscher that the high margin, model-specific transaction quantities or physical characteristics might somehow distinguish them as one-off aberrations when compared to the lower-margin model-specific data, see, e.g., Dongguan Sunrise Furniture Co. v. United States, 37 CIT ___, ___, 931 F. Supp. 2d 1346, 1356 (2013) (holding unreasonable "Commerce's reliance on minuscule percentages of sales to determine the partial AFA rates"), but Hubscher chose not to provide that comparison.  All Hubscher offers is the general argument that the higher-margin model-specific data must not have been significant given the low resulting margins in the investigation.  This is not enough.  In short, Hubscher has not enabled the court to declare unreasonable Commerce's inference that Hubscher dealt in higher margin merchandise.  At best, Hubscher has only established that there may be other possible inferences from the administrative record about Hubscher's actual dumping margin.  Commerce, by contrast, has offered a reasonable path for the court to conclude that the 137.20% total AFA rate may be a reasonably accurate estimate of Hubscher's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.

...

Court No. 13-00004                                                                                          Page 12

## IV. Conclusion

For the foregoing reasons, Hubscher's motion for judgment on the agency record is denied. Judgment will be entered accordingly.

                                                                                                 /s/ Leo M. Gordon  
                                                                                                  Judge Leo M. Gordon

Dated: November 8, 2013  
        New York, New York